**Frank SUAREZ, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 19049.**

United States Court of Appeals Fifth Circuit.

Nov. 14, 1962.

Joe Brown Booth, W. Emory Dougherty, Miami, Fla., for appellant.

Paul E. Gifford, Asst. U. S. Atty., Alfred E. Sapp, Asst. U. S. Atty., Miami, Fla., Edward F. Boardman, U. S. Atty., Southern District of Florida, Edith House, Asst. U. S. Atty., for appellee.

Before RIVES, JONES and GEWIN, Circuit Judges.

GEWIN, Circuit Judge.

Frank Suarez, Defendant-Appellant, was convicted by a jury on all six counts of an indictment charging him with the purchase and sale of cocaine, in violation of Title 26 U.S.C.A. § 4704(a) and § 4705 (a). On three occasions, Suarez sold to a federal narcotics agent, William H. Mattingly, quantities of cocaine. Suarez was paid $25.00 for 900 milligrams delivered on August 2, 1960; $50.00 for 300 milligrams delivered on August 12, 1960; and $25.00 for one gram delivered August 23, 1960. With respect to the above transactions, Suarez was indicted for the purchase of the cocaine, not in and from the original stamped package (odd numbered counts), and the sale of it, not pursuant to an order form prescribed by the Treasury Department (even numbered counts).

The errors specified and the contentions of Suarez may be summarized as follows: (1) He was entrapped by the Government Agent into committing the crime; and

(2) the Court erred in failing to appoint an interpreter to interpret his testimony at the trial. Agent Mattingly had a government informer working for him on narcotics cases in Miami, Florida. The informer introduced Suarez to Mattingly in Suarez's barber shop, but did not disclose that Mattingly was a government agent.

Later, on August 1, 1960, Mattingly went to Suarez's barber shop and told Suarez that he wanted to buy one bottle of cocaine. Suarez replied, "I don't have the cocaine now, but give me the money.". Mattingly then gave Suarez $25.00. The money was furnished by the government. The next day Mattingly came back, went into the backroom of the barber shop with Suarez and received from him a quantity of cocaine.

On August 10, Mattingly went back to the barber shop, met with Suarez and asked him to sell him (Mattingly) two bottles of cocaine, at which time Suarez said that he didn't have the two, but that he could get them, and he requested Mattingly to give him the money then. Mattingly then gave him $50.00. This money was furnished by the government. Suarez said, "Keep checking with me and I'll let you know." On August 12, Mattingly went to the shop again, went into the back room, and was given a quantity of cocaine by Suarez.

Then, on August 23 Mattingly met with Suarez in the morning at approximately 10 o'clock and asked him for one bottle of cocaine, to which Suarez replied, "Well give me the money and I'll see what I can do. I'll see if the man has got any." Mattingly gave him $25.00 of government money at that time. Mattingly came back later that afternoon and the same procedure of going into the back room of the barber shop was followed. Agent Mattingly was provided with a quantity of cocaine the third time by Suarez. Mattingly left the barber shop, gave a signal to two other narcotics agents who went into the barber shop and arrested Suarez. Suarez admits the transactions in connection with the cocaine, but he says he should have been acquitted be-cause he was led into or induced to commit the acts by a representative of the Government.

The issue of entrapment was presented to the jury under careful instructions from the trial judge, to which there was no exception. The issue was resolved against Suarez and he was sentenced to ten years on each count, sentences to run concurrently. Suarez contends that he was entrapped as a matter of law, and that issue should not have been submitted to the jury.

The Supreme Court, in the case of Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), read a legislative intent into criminal statutes to the effect that Congress could not have intended that the processes of crime detection and law enforcement should be abused by the instigation by government agents of an act on the part of persons, otherwise innocent, in order to lure them into the commission of a crime and then punish them. In that case, the issue was not allowed to go to the jury by the trial judge. The Supreme Court held that the issue of entrapment under the facts and circumstances of the Sorrells case should have been submitted to the jury.

In Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), a case strongly relied upon by Suarez, the Supreme Court reversed the trial court for submitting the issue of entrapment to the jury, holding that the defendant was entrapped as a matter of law. In that case it was the undisputed testimony of the prosecution's witness that the sales of narcotics made to the government's informer, were brought about by the informer's persistent solicitation in the face of obvious reluctance on the part of the defendant, whom the informer believed to be undergoing a cure for narcotics addicts, and by the informer's appeals to sympathy based on mutual experiences with narcotic addiction plus the informer's story of his own suffering. In defining the law of entrapment, the court held:

"However, the fact that government agents 'merely afford opportunities

or facilities for the commission of the offense does not' constitute entrapment. Entrapment occurs only when the criminal conduct was 'the product of the *creative* activity' of law-enforcement officials. (Emphasis supplied.) See 287 U.S., at 441, 451 [53 S.Ct. at 212, 216]. To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal."

█ The foregoing principle of law has been followed by this Circuit prior to and since the decision in Sherman, supra. Gargano v. United States (5 Cir., 1928), 24 F.2d 625; Demos v. United States (5 Cir., 1953), 205 F.2d 596; Accardi v. United States (5 Cir., 1958), 257 F.2d 168. Clearly, the question as to whether the government officials merely afforded the defendant an opportunity to commit a crime, which the defendant voluntarily committed when such opportunity afforded itself; or whether the offense originated in the mind of the government agent who lured the defendant into its commission, is an issue to be decided by a jury, unless the evidence admits of no other interpretation but that the defendant was entrapped. Here, we hold the issue was properly submitted to the jury after careful instructions by the trial court.

█ Indulging a presumption in favor of the Government as we must do on appeal, we conclude that there was ample evidence for the jury to find that Suarez was not entrapped. Suarez always fixed the price to be paid for the cocaine. He requested Agent Mattingly's phone number, and later asked for it again, stating that he had lost the number; and in fact, he did attempt to make several phone calls to Mattingly, presumably to discuss the narcotics transactions. Suarez showed no evidence of reluctance at any time as was the situation in the Sherman case, but quite to the contrary, he was a ready, willing and able supplier of narcotics.

The evidence as a whole shows that Suarez was trapped—not entrapped.

Counsel for Suarez relies strongly on the answers to two leading questions propounded by him to Agent Mattingly at the hearing before the United States Commissioner:

"Q. And that was Government money that you were supplying Suarez with to get you cocaine?

"A. Yes, sir.

"Q. Huh-huh. And you gave him the $25 for the purpose of inducing him to get the cocaine?

* * * * * *

"THE WITNESS: Would you rephrase that again, sir?

"MR. BOOTH: Read the question, Mr. Reporter.

"(The pending question was thereupon read by the reporter as above recorded.)

"THE WITNESS: Yes, sir."

Later in the testimony the same question was asked:

"Q. And at no time did you tell him that this person who introduced you to him was a Government agent?

"A. No, sir.

"Q. But you gave him the money to induce him to supply you with narcotics?

"A. Yes, sir."

At the trial of the case, the agent explained that he did not consider the technical and legal significance of the word "induce" before answering the question at the Commissioner's hearing. Certainly, these two "Yes" answers to these leading and loaded questions cannot be construed to mean that Agent Mattingly has admitted coaxing an innocent person into committing an unlawful act which he had no predisposition to commit. At any rate, as we have pointed out, the issue of entrapment was clearly presented to the jury by the distinguished trial judge and the jury could give whatever weight to these answers they thought was merited in the circumstances.

Narcotics traders seldom peddle their wares in the marketplace. They deal in stealth and strategem. Often government agents must deal also in stealth and strategem. To induce an otherwise unwary and innocent person to commit a crime simply for the opportunity of prosecuting that person for the crime, cannot be tolerated under our system of law. It is when the conduct and methods of law enforcement officers falls to this level, that the courts will extend protection to the accused individual. The defense of entrapment is available to the defendant under a plea of not guilty. The defendant was permitted to fully develop such defense in this case. Under the facts presented by the entire record, we cannot say that it was improper for the court to submit the issue of entrapment to the jury under careful instructions as were here given.

■ Suarez further contends that the trial court erred in failing to appoint an interpreter while he was testifying in his own behalf. Suarez is of Cuban extraction, born in the United States, and has lived in this country continuously since 1933. He served in the Army for three years. Although Suarez did not speak grammatically correct English in all instances, we are convinced from a reading of the transcript that he had sufficient command of the English language to convey his thoughts to the jury. The chief objection seemed to be that Suarez talked too softly and too swiftly. The prosecutor asked the Court twice if an interpreter was necessary. At neither time did counsel for Suarez make a suggestion that an interpreter should be provided. This point was not raised in Suarez's Motion for a New Trial and is raised here for the first time. The use of an interpreter is discretionary with the trial judge. Perovich v. United States, 205 U.S. 86, 27 S.Ct. 456, 51 L.Ed. 722 (1907). We find no abuse of discretion in this case.

The judgment is

Affirmed.